IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BARBARA J. PALLADINO | ) | |
| | ) | CA |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| d//b/a/ DEPARTMENT OF CORRECTIONS | ) | |
| Defendant. | ) | (Electronically filed) |

## COMPLAINT

AND NOW, comes Plaintiff Barbara J. Palladino, by her attorneys, Helen R. Kotler, and

David F. Weiner, and sets forth the following:

### NATURE OF ACTION

1.      Barbara J. Palladino ("hereinafter "Plaintiff"), by and through her attorneys, Helen R.

Kotler, Esquire, and David F. Weiner, Esquire, brings this action under Title VII of the Civil

Rights Act of 1964, as amended, and the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq.

("hereinafter Section 504") to correct unlawful employment practices based on sex, disability,

and retaliation and to provide appropriate relief to Plaintiff, who was adversely affected by such

unlawful employment practices while employed by Defendant Commonwealth's Department of

Corrections ("Defendant.")  Further, Plaintiff seeks injunctive relief pursuant to the Americans

With Disabilities Act, 42 U.S.C. § 12102(2)(A).

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331 and 1343, 42 U.S.C. § 12133, 29 U.S.C. § 794a.  The Court may grant declaratory and

other relief pursuant to 28 U.S.C. §§ 2201 and 2202.  The events set forth in this complaint occurred within the Western District of Pennsylvania where Plaintiff resides.

## PARTIES

3.      Defendant is the Commonwealth of Pennsylvania d/b/a Department of Corrections, and all times relevant hereto operated a correctional facility in Mercer, Pennsylvania, ("SCI-Mercer") in the Western District of Pennsylvania.

4.      At all times relative hereto, Defendant Commonwealth's Department of Corrections was the direct and indirect recipient of federal financial assistance including but not limited to State Criminal Alien Assistance funds, Residential Substance Abuse Treatment (RSAT) program funds, and Prisoner Reentry Initiative Grant Awards of which some funds were directly used at SCI-Mercer.

5.      Plaintiff, at all times relative hereto, is a resident of Butler County in the Western District of Pennsylvania.

## STATEMENT OF FACTS

6.      Plaintiff, a female born in 1961, began to work for Defendant in June 1994 as a Psychological Services Specialist.

7.      Plaintiff's duties included assessing patients, writing reports on her assessments that were used by the parole board and others, and providing individual therapy and group therapy to inmates in the all male facility.

8.      Plaintiff was one of a small team of psychologists at SCI-Mercer consisting of a psychology manager who reported to one of two Deputy Superintendents, three or four therapists, and a clerk typist.

2

9.      Plaintiff became the butt of bullying and harassment by a clerical staff member and several co-workers who were psychologists, that became unbearable after a period of years during which time Plaintiff became anxious and depressed.

10.     Plaintiff's problems with several co-workers exacerbated with the 2005 retirement of the psychology manager who had been supportive of her.

11.     For example, around June 2005, when Plaintiff gave a presentation in a class, the two co-workers, Denise Schiavo and Dawn Marie Wentzel, rolled their eyes at her, snickered, and laughed loudly at her presentation.  Several attendees expressed their concern and asked if Plaintiff was okay, and one staff member issued a memo commenting on the rude behavior.

12.     To make matters worse, beginning in or around the spring or early summer 2005, Superintendent Paul Stowitzky ("Stowitzky") began expressing a personal interest in Plaintiff who rejected his advances.

13.     Stowitzky, who is married, seemed intrigued with Plaintiff's lack of personal attachments as a single woman, and began to ask about how he could "remedy" this situation, even calling her at work to discuss a sexual fantasy involving her.

14.     Plaintiff tried to ignore this conduct and initially refrained from reporting his inappropriate conduct, hoping that Stowitzky would accept her rejection and cease his conduct.

15.     In August 2005, the office clerk-typist, who was allied with Plaintiff's hostile co-workers, allowed a door to slam painfully on Plaintiff's hand, another co-worker failed to tell Plaintiff about an important staff meeting, and the clerk-typist became resistant to typing Plaintiff's reports.

16.     By fall 2005, Stowitzky appeared jealous when Plaintiff interacted with male Corrections

Officers, many of whom she knew for years as coworkers and with whom she had become friends.  He would question her interactions with them.

17.      Around September 27, 2005, Plaintiff wrote a memorandum to her supervisors regarding her problems with several co-workers which she described as a hostile and bullying environment and described her memo as a cry for help, saying she feared for her physical health.  She asked for several accommodations including moving her to another location, assigning a new clerk typist, and excusing her from staff meetings unless someone neutral could attend **to** see how her co-workers were treating her.

18.      Plaintiff asked for a meeting related to her letter, submitted some articles about workplace bullying, and attached documents that she felt documented degrading acts toward her.

19.      Around October 5, 2005, Plaintiff met with Superintendent Stowitzky, Deputy Superintendent Debra Sauers and Acting Supervisor Stewart Wellman, and told them that she was undergoing depression because of the hostile environment.

20.      After the meeting, Wellman, who is not a medical doctor, told Plaintiff she should be on a medication used to treat psychotic patients that caused Plaintiff to believe that Wellman thought she was paranoid and psychotic.

21.      After that, a Parole Supervisor who worked at the facility, although not part of the Department of Correction, wrote to Stowitzky, Sauers, and Wellman about the excellent work performed by Plaintiff and noted her own observations that Plaintiff was the victim of cruel jokes and vicious rumors from members of her own Department about alleged "love affairs with members of the corrections staff."

22.      Thereafter, her supervisor, Stewart Wellman, began to scrutinize her work closely.

4

23.     Plaintiff's condition began to deteriorate in late October 2005 which impacted her work, compelling Plaintiff to advise Wellman of her condition.

24.     Plaintiff began treatment with a therapist around October 18, 2005, and then saw a psychiatrist, Dr. Jose Santiago, on or around October 30, 2005 who prescribed medication, and recommended a leave of absence.

25.     Doctor Santiago diagnosed Plaintiff as suffering from Major Depression, Recurrent Severe and anxiety that caused her to have difficulty concentrating, feelings of dysphoria, sadness, fatigue, and sleeping problems.

26.     Around late October 2005, Plaintiff informed Ms. Sauers that she had seen a therapist who felt she was experiencing symptoms of depression and anxiety/post traumatic stress disorder from her work environment.  She also told her supervisor she was having trouble concentrating and completing her reports.

27.     Because of her deteriorating condition, Plaintiff took a medical leave from November 7, 2005 through December 12, 2005.

28.     Shortly before leaving on her sick leave, on or around Friday, November 4, 2005, Plaintiff became aware that additional false rumors were being spread about her including that she was off on a suspension because she had been caught by two commissioned officers having sex with a correctional officer in her office.

29.     These rumors created a dangerous and humiliating environment for her in that the rumors were so rampant that an inmate, whom she had treated for years, asked her if there was any truth to these rumors.  Another version of the false rumor was that she had a sexual relationship with an inmate.

5

30.     Because the rumors became so widespread and pervasive that an acquaintance of Plaintiff who worked at another correctional facility heard the rumor, Plaintiff asked the Superintendent's secretary to circulate an email saying she would be on a medical leave which she hoped would quell the rumors that she was suspended for sexual misconduct.

31.     To make matters worse, while Plaintiff was off on medical leave, the Superintendent issued a November memo that directed non-uniformed staff to enter the facility no earlier than ½ hour before their start time and that they must leave no later than ½ hour after their quitting time. Stowitzky and others knew that Plaintiff routinely stayed late to complete her work.

32.     Around December 1, 2005, Plaintiff gave Stowitzky a note from her doctor who released her to return to work on December 12, 2005.

33.     Plaintiff asked Stowitzky if he would transfer her to another location away from her co-workers to which the Superintendent responded that he would consider it but he did not want her entertaining officers, implying that he gave credence to the false rumors.

34.     In his return to work note, Dr. Santiago stated that any "continual stressful/hostile environment "would be detrimental to Plaintiff's recovery.

35.     The rumor about Plaintiff being suspended for having sex with a guard, re-emerged in mid-December 2005 when an aggressive inmate told her that he heard she had sex with a guard. He was disrespectful to her, something that had not occurred in the past.

36.     On December 6, 2005, Plaintiff wrote to Stowitzky and asked for three accommodations: (1) Relocate her office and her group therapy sessions away from Building #28, (2) assign a different clerk typist, and (3) permit her to work from 10:00 a.m. to 6:00 p.m.  She asked for an opportunity to interact with him and her doctor to develop accommodations.

37.    Plaintiff had developed severe sleep problems because of the hostile, pervasive atmosphere at work that made it difficult to work her current hours of 9:00 a.m. to 5:00 p.m. Other staff members had been allowed to change schedules.

38.    Plaintiff requested these accommodations to reduce contact with her co-workers and to relieve the effect of sleeping problems that she was experiencing because of her medical condition.

39.    On or around December 8, 2005, Stowitzky told Plaintiff that the psychology clerk-typist with whom she had a problem was being reassigned effective January 3, 2006 and Plaintiff could work in a different location until the clerk-typist left.  The next day, Sauers revoked the proposed transfer of location.

40.    On December 12, 2005, the day that Plaintiff returned to work, Wellman punished Plaintiff for her absence by telling her that because she had been off, she would have to turn in one PCRA Psychological Evaluation and Clinical Risk Assessments ("PCRA") a day, an almost impossible assignment that no other employee had to do then or in the past when they had been off ill.  A PCRA is a comprehensive psychological evaluation required by the Pennsylvania Parole Board on all violent offenders.

41.    On December 16, 2005, Plaintiff's counsel also wrote to Stowitzky, repeating Plaintiff's requests for accommodations, and expressing concerns that Plaintiff was being retaliated against, and asked to begin an interactive process to accommodate her.

42.    Wellman regularly began to badger Ms. Palladino for the PCRA reports, and when she explained she was having problems, he said something to the effect that he was not interested in her condition, although he denied that he was trying to make her quit.

43.     On December 27, 2006, Wellman demanded that she issue a progress report to him

every day, and once when she gave him a PCRA, he said in a demeaning way, "Good girl";

although he refused Plaintiff the necessary clerical help, and further, told Plaintiff that his

directives regarding PCRA' were to be considered disciplinary steps.

44.     Wellman would not permit Plaintiff to work overtime or for compensatory time to

complete the PCRAs although he allowed her co-workers to work late during this period.  This

seriously disadvantaged Plaintiff who had to miss some work due to ongoing therapy.

45.     On December 28, 2005, Plaintiff received an anonymous note from an inmate stating that

another inmate was discussing that the administration had caught her in a compromising

position.

46.     Meanwhile, Plaintiff's co-workers and supervisor ignored her even failing to invite

her to a Christmas spread, by putting Christmas decorations on all office doors but hers, and

excluding her from staff training.

47.     Wellman, the Acting Supervisor, who was a contract worker, left the facility at the end

of December 2005.

48.     On January 5, 2006, two corrections officers told Plaintiff that Deputy Sauers had been

checking only on Plaintiff to see if she had been working late contrary to newly issued orders

which prohibits staying more than thirty minutes after quitting time.  These orders from

Stowitzky appeared related to the rumors about Plaintiff who was the staffer most likely to work

late.

49.     Around January 6, 2006, Stowitzky called Plaintiff to a meeting where he referenced

her attorney's letter, asked her what her attorney expected him to do with her letter, asked what

an interactive process was, and told her that he was not moving her out of the building and not

changing her hours.  Further, he said that he was not doing anything until she filed a charge and

told her she did not have a case.

50.     Plaintiff's new supervisor, Wallace O'Shell, started around January 2006 but was in

training for most of January 2006.

51.     O'Shell met with Plaintiff and told her that Sauers expected O'Shell to enforce the one

PCRA per day order and said he was not sure if the meeting was disciplinary so that Plaintiff

needed a union representative.

52.     Plaintiff began to cry after which O'Shell asked her if she considered taking disability.  A

few days later, Sauers sent Plaintiff a critical memo relating to the fact that she questioned

whether she should have a union representative present.

53.     Plaintiff's condition began to decline and on January 20, 2007, caused her to submit a

note to Human Resources from her doctor asking that she be placed on a light duty schedule.

54.     In February 2006, Plaintiff was denied access to various materials that were kept locked

in the clerk-typist's office when the clerk-typist was not in her office.

55.     Plaintiff submitted a letter from her doctor, dated around February 15, 2006, to Human

Resources in which the doctor made some recommendations for accommodations, namely that

Plaintiff should not be required to complete duties assigned while on sick leave, that she should

not work more than 37.5 hours per week or outside her work setting, that she work halftime

completing her own job duty functions, and the other time working a modified schedule of duties

not requiring a high level of cognitive functioning such as answering phones, filing and stocking

shelves, that she be allowed to work 10:00 a.m. to 6:00 p.m., and that her office be relocated to

9

another building.  Human Resources denied receiving this letter.

56.     On February 22, 2006, Plaintiff attended a staff meet when Schiavo berated her
and made comments about her personality, in so loud a tone that others heard this after which
Plaintiff submitted an incident report.

57.     Plaintiff's counsel  wrote another letter to the Superintendent on February 27, 2006,
raising the issue of retaliation because of Plaintiff's disclosure of her disability and request for
accommodation.

58.     In the letter, Plaintiff, through counsel, on February 27, 2006 asked the
Superintendent to review the matter and initiate an interactive process to provide needed
accommodations, and Plaintiff not be required to produce more than what others had to produce.

59.     Plaintiff's counsel described to Stowitzky that on her first day back, Plaintiff's supervisor
told her that she would now be required to submit one PCRA per day, an almost impossible
burden for even an employee who was in top condition.

60.     While her co-workers were told they had to increase their PCRAs, only Plaintiff who
had been off had less time to complete the assigned PCRA, had the impossible task involving
completing fifteen PCRA's by December 31, 2005, unlike her co-workers who had to complete
fifteen PCRA's in a four-week period.  Unlike Plaintiff, her co-workers were allowed to work
overtime to do the work

61.     Before Plaintiff's return from leave, the average number of PCRA's to be completed
was seven per month.  No other employee was being asked to produce so many PCRA's in so
short a period of time.

62.     The assignment of completing one PCRA per day appeared retaliatory as if it were a

punishment for Plaintiff's missing work.

63.    The Superintendent ignored the letters from both Plaintiff's counsel and her doctor and her requests to engage in a process to help accommodate Plaintiff although Defendant accommodated a male co-worker by moving him to a different section when he complained of second hand smoke.

64.    Further, the Defendant through its managers, not only refused flexible hours but denied compensatory time to Plaintiff, while giving such time to her co-workers, making it easier for them to complete their assignments.

65.    Plaintiff was subjected not only to a sexually hostile environment, but harassment due to her illness where her managers allowed co-workers to scream at her at a meeting, although such conduct is prohibited.

66.    When Plaintiff raised her concerns with her manager, he suggested that she consider returning to her prior place of employment.

67.    Not only did Defendant ignore Plaintiff's requests sent through her attorney, but subjected her to more than usual scrutiny all of which caused her condition to deteriorate so that she had to take a second leave due to her condition.

68.    Before disclosing her depression, seeking accommodations, and raising retaliation, Plaintiff received excellent performance reviews.

69.    For example, in a December 8, 2004 performance review, Plaintiff received six "outstandings" and one "commendable." Sauers wrote, "I agree with Mr. Dunstan's evaluation and comments.  She is highly energetic and motivated in her work.  Ms. Palladino is someone who can be counted on to perform her duties in an exceptional manner.  Mercer is fortunate to

have her on its team."

70.     After hearing from Plaintiff's attorney, O'Shell began to reiterate that Plaintiff was
to perform one PCRA per day in addition to her other duties specifying this in an email on or
around March 14, 2006.

71.     After meeting with Plaintiff, Doctor Santiago advised Plaintiff to take a day off on
March 17, 2006.

72.     On or around March 27, 2006, Deputy Superintendent Sauers evaluated Plaintiff in
seven categories, giving her five, "needs improvement, one "satisfactory," and one
"commendable" in job knowledge skills.

73.     When Plaintiff asked Sauers if she had seen her doctor's letter, Sauers told her that
as far as she was concerned, Plaintiff was already working light duty and allowing her to work
from 10:00 a.m. to 6:00 p.m. was not possible because Plaintiff needed to be supervised.

74.     As a result of Defendants' failure to accommodate Plaintiff, and the continuing
harassment, Plaintiff was forced to take a second medical leave to be effective on or around
March 29, 2006.

75.     Because of the lowered evaluation, Plaintiff's opportunity to transfer into another job
with the Commonwealth was minimized.

76.     When Plaintiff took Doctor Santiago's excuse regarding the medical leave to Sauers,
Sauers sent O'Shell to escort her out of the building which would make it appear that Plaintiff
had committed some terrible offense, and give more credence to the rumors about her as this type
of treatment has traditionally been reserved for the most egregious of conduct.

77.     Only after Plaintiff begged the Superintendent to not do this and **to** allow her to complete

12

a delayed report, did he let her stay for two more hours and allowed her to leave without an escort.

78.     On or around March 31, 2006, Plaintiff filed EEOC Charge No. 533-2006-00354 that was dually filed with the Pennsylvania Human Relations Commission in which she claimed a continuing course of discrimination based on sex, disability, and retaliation.

79.     On May 4, 2006, on June 13, 2006, and again on July 11, 2006, Dr. Santiago requested that Plaintiff's leave be extended.

80.     During the period that Plaintiff was off work, she used many hours of personal, vacation, and sick leave that she had accumulated over the years before she became ill.

81.     While she was on leave, Plaintiff contacted the Commonwealth's Office of Vocational Rehabilitation for services and began looking to see if she could find other work.

82.     Sometime in the summer of 2006, while Plaintiff was on sick leave, her supervisor, Wallace O'Shell, left his employment and the Department of Corrections named Stuart Steinberg as the Licensed Psychology Manager.

83.     Steinberg began work at SCI-Mercer around November 2006, reporting directly to Deputy Superintendent Debra Sauers who reports to Superintendent Stowitzky.

84.     Plaintiff returned to work from her sick leave on or around September 12, 2006, only to find  that her office had been ransacked and several sensitive files were missing, although staff and no inmates had access to her office.  A note from an inmate to Plaintiff stating that the zipper in her pants was coming down was placed in a highly visible location on her desk.

85.     Plaintiff found that furniture was scattered around the room, her computer was disabled and the keyboard was disassembled.

13

86.     Upon her return, with no discussion or interactive process, Plaintiff was given a
Modified Duty Job Description, which appeared to be disciplinary and calculated to force
Plaintiff out.  It included moving Plaintiff's starting time to 8:30, instead of 9:00 a.m. although
Plaintiff had asked to start at 10:00 a.m. due to her serious sleep problems.

87.     Sauers scheduled Plaintiff to work as a switchboard operator half the time, report directly
to Sauers and meet with Sauers weekly, manage her leave (i.e. doctor's appointments) to
complete the minimum standard assigned, take no work home, and created a "house arrest" status
where Plaintiff could not leave the building without permission.  Sauers eliminated the
psychology duties that she knew Plaintiff enjoyed performing.

88.     Sauers' actions made it obvious to all, Plaintiff's co-workers and inmates, that she had
been dropped into a lowered status and was being treated adversely.

89.     As a result, Plaintiff reported that on December 12, 2006, an inmate was reluctant to be
part of her group and questioned her professional ability and stated that he overheard staff
members saying that Plaintiff was to be fired for having sex with multiple officers and that he
overheard that Plaintiff was "crazy"all of which humiliated and demoralized Plaintiff.

90.     Sauers refused to allow Plaintiff to take professional training that she had missed, stating
she was on modified duty.

91.     At a meeting held before Steinberg started, Supt. Stowitzky mentioned that Steinberg
engaged in inappropriate conduct in his prior employment which Plaintiff learned from a co-
worker who attended the meeting.

92.     After Steinberg began working at SCI Mercer, he told the psychology staff that his
psychology license was on probation and he had to attend monthly face-to-face meetings with a

14

clinical supervisor, Kathy Parsons, Assistant Chief Psychologist for the Department of Corrections.

93.     Steinberg downplayed that matter of his license claiming that his license was on probation because of an anonymous complaint that he had dated a patient well after the professional relationship ended.

94.     On or around January 3, 2007, after seeing a corrections officer enter the building around 4:30 p.m., Steinberg told Plaintiff she should not allow officers in the building after hours because of her reputation.  Plaintiff did not summon the officer, nor was it after hours, nor was the building empty of staff.

95.     On or around January 4, 2007, because of his comments, Plaintiff asked Steinberg if he heard the false rumors that she was suspended (when she was actually on medical leave) because of being caught having sex with an officer in her office.

96.     Steinberg replied that those things happen and mentioned a female psychologist who was impregnated by an inmate and said that having a male guard in her office did not look good because inmates could see into her office window.

97.     In early January 2007, Plaintiff became anxious upon learning that the psychology department was moving from Building 28 to the Infirmary into a very closed-in area, forcing even closer contact with her co-workers.

98.     First, around January 10, 2007, Steinberg told Plaintiff that he and a male co-worker, John Uber, were agreeable that she could have the office assigned to him which was less confined and closer to the exit door which her therapist thought would be better for her.

99.     Late on or around January 11, 2007, Steinberg told Plaintiff that Deputy Sauers said

Plaintiff could not switch offices with Uber, all of which caused Plaintiff to suffer a serious anxiety attack that required her to seek medical attention.

100.    On January 12, 2007, Plaintiff begged Sauers to let her work and remain at least part time in the old building, Building 28, which Sauers said was up to Steinberg.  Sauers accused Plaintiff of failing to timely submit PCRA's, although others did not submit theirs on time, and she questioned Plaintiff's fitness for duty.

101.    That same day, a Supervisor located in a different department, told Plaintiff that Steinberg asked her if she minded if Plaintiff worked half a day in Building 28, and the Supervisor said it was fine.  Steinberg then mentioned the name of the corrections officer who was the subject of rumors about Plaintiff and said he did not want the officer near Plaintiff because he knew something was going on.  The Supervisor told Plaintiff that "they are watching every move you make."

102.    Plaintiff felt very uneasy about Steinberg, whom the Board of Psychology had publically disciplined for entering into a long term sexual relationship with a female patient within a few weeks of referring her to another psychologist, because he used his position over a vulnerable female.  Plaintiff felt very vulnerable because of her health, the failure of her superiors to accommodate her, and the harassment which was occurring, and feared Steinberg would react adversely to her vulnerability.

103.    With no warning, around January 17, 2007, Steinberg arranged for Plaintiff's belongings to be moved from her old office to the new office, the smallest office, although Plaintiff had worked in the department longer than the others.

104.    On or around February 5, 2007, someone left an offensive cartoon in Deputy Sauers'

mailbox relating to Plaintiff which Sauers republished to all of the managers, including

Steinberg.

105.    Plaintiff continued to ask for appropriate accommodations including asking to move

to a different location and changing her hours due to her sleep problems.

106.    In spite of numerous requests, Steinberg failed to provide Plaintiff with a key to the

nearest restroom, so she had to ask corrections officers or others to let her in.

107.    Around February 27, 2007, still without a restroom key, Plaintiff left her office around

5:20 p.m., planning to use the rest room on her way out in an area open to all employees 24

hours per day and while there, she chatted with another employee.

108.    That day, Superintendent Stowitzky sent an email timed at 6:08 p.m. (18:08) to

Steinberg and Deputy Sauers claiming he watched Plaintiff leave the facility at 6:10 p.m. (18:10).

He questioned why she was still at the facility when she was supposed to leave by 5:00 p.m.

(17:00), and singled her out in an apparent effort to discredit her.  Stowitzky also questioned if

Plaintiff was doing the same work as other psychologists or if she was still on modified duty.

109.    Around March 2, 2007, Steinberg emailed Plaintiff  to attend a "coaching session" with

him but when she asked to have a union representative present, he dropped the matter.

110.    Thereafter, Steinberg began a course of even closer intense discriminatory and retaliatory

actions, and sarcastic comments.  On one occasion when Plaintiff struck her knee on a wall

mounted electrical receptacle box, Steinberg sarcastically asked if she was going to file a claim

for "emotional trauma."

111.    Plaintiff began to feel anxious when on or around March 4, 2007, William Ponton who

headed SCI-Mercer's Human Resource department asked her to attend a fact-finding meeting

17

but refused to tell her what the meeting was about.  This was rescheduled to April 4, 2007 so

Plaintiff's off-site union representative could attend.

112.    Ponton stated that Supt. Stowitzky asked him to conduct an investigation on an EEO

charge against Plaintiff by Steinberg, but Ponton refused to describe the nature of this charge.

113.    Based on the questions asked by Ponton, Plaintiff surmised that Steinberg alleged that she

spoke to another psychologist/co-worker and/or brought a document to the workplace relating to

Steinberg's discipline from the Psychology Board of the Commonwealth.

114.    Plaintiff did discuss her fear of Steinberg with a co-worker, that the disciplinary matters

of which Steinberg was guilty were of a nature where he used his position to enter into a

relationship with a vulnerable patient, all matters available to the public.

115.    Plaintiff explained that she knew this as Stowitzky had discussed Steinberg's status,

and Steinberg mentioned it to her.

116.     Steinberg's discipline was a matter of public record at the Prothonotary of the

Pennsylvania Department of State, Bureau of Occupational Affairs which showed that he was on

probation, and his license had been suspended for five years commencing on September 18, 1999

because of gross incompetence, negligence or misconduct in carrying on the practice of

psychology, and engaging in a relationship with a client which might impair his professional

judgment or increase the risk of exploitation, exploiting his professional relationship with a client

and engaging in professional misconduct.

117.    The record shows that Steinberg acknowledged that in his personal life he has been

involved with women who tended to be "emotionally needy."

118.    Steinberg knew that Plaintiff was a vulnerable female who had been victimized by co-

18

workers in the past.  When he assigned Plaintiff to work on a project with the Drug and Alcohol

Supervisor, Plaintiff told Steinberg that she did not want to work with him because in or around

1997 or 1998, the supervisor had made unwanted obscene phone calls to her after which he was

eventually caught and suspended.

119.    Immediately after the fact-finding, Deputy Sauers entered the room and told Plaintiff that

she had to call Steinberg each day when she entered the facility because she was fifteen minutes

late on April 4, 2007 although Plaintiff was only a few minutes late, and  that her supervisor had

"unofficially" counseled her about tardiness which was untrue.  Sauers provided no record of the

counseling required by the collective bargaining agreement, nor would Sauers agree to provide

the security file what would establish the actual time of Plaintiff's arrival.

120.    Plaintiff's union filed a grievance on April 5, 2007, regarding this reporting requirement.

121.    Around March 19, 2007, becoming anxious that she could not complete her assigned

PCRA's, Plaintiff asked Steinberg who had assigned her two PCRA's which he previously

assigned to Denise Schiavo, if he would reassign them back since this additional assignment gave

Plaintiff a total of nine PCRA's and she discovered that one of the two PCRA's was quite

complex, and was not just an update as Steinberg said.

122.    Unlike Schiavo who had ten hours of group meetings per month, Plaintiff was assigned

19 hours of group meetings while another co-worker, Tom Burkhart, had 16 hours of group

meetings.  While John Uber had more hours of group meetings, his groups were of a different

nature, not requiring the same level of documentation as Plaintiff's, all of which made

Steinberg's reassignment of the PCRA's an extra burden the others did not have.

123.    Steinberg angrily refused Plaintiff's request, and threatened that if Plaintiff had difficulty

19

meeting her minimum job requirements, he would see if she needed modified duty or supervisory assistance again and he denied that he had reassigned Schiavo's PCRA's to Plaintiff even though the original assignment showed he had.

124.   Plaintiff's Union Representative, Erma Rhodes and Plaintiff met with Mild on April 13, 2007 where Plaintiff learned that Steinberg was now accusing her of being insubordinate to direction and assignments.

125.   Steinberg incorrectly accused Plaintiff of not turning in the nine PCRA's which were due even though she had documentation to show these were all submitted, accused her of refusing a last-minute assignment on March 29, 2007 which Steinberg assigned even though Plaintiff explained upon its receipt that she could not complete it that day because she had a doctor's appointment immediately followed by a group session that she led.  She told him that the assignment would mean that a guard would be required to accompany her, as a female, to the prison site causing the guard to work overtime to which Steinberg did not reply.

126.   Further, the assignment that Steinberg gave Plaintiff on March 29, 2007, as she understood it, was a 30-day review where he wanted her to interview two inmates and write up a note about their mental health status.  She had never previously completed such a review which she understood was normally performed by a committee on which Steinberg sits.

127.   Plaintiff was never the subject of discipline until she complained of discrimination.

128.   On May 8, 2007, Plaintiff was subjected to a humiliating, sexually harassing event when the newly appointed Deputy Superintendent Ruffo came to her office and asked her to step out into the brightly lit conference room with him and Steinberg, a room in plain view of both staff and inmates.

129.    Steinberg and the Deputy Superintendent asked Plaintiff to stand immediately before them and slowly turn.  As she did, they closely scrutinized her buttocks and area below the waist causing Plaintiff great humiliation.

130.    Plaintiff learned that Steinberg reported to Deputy Superintendent Ruffo that he could see the outline of her underwear through her trousers although these were the same lined trousers that she had worn in the past and were identical to other different colored trousers of the same style, brand, and size that she wore on numerous occasions in the past with no comment.

131.    This act, intended to demean Plaintiff, was part of a pattern and practice of inappropriate scrutiny and comments toward Plaintiff and about her that Steinberg and the Department of Corrections allowed to occur as part of a hostile environment which included permitting or starting false rumors about her.

132.    That Mr. Steinberg is a psychologist who knew that Plaintiff was under psychiatric treatment made his conduct and that of the Defendant even more of an intentional nature in that he should have been aware of the deleterious effects of his acts toward Plaintiff.

133.    The events of May 8, 2007, caused Complainant's condition to exacerbate significantly, and on May 17, 2007, Dr. Santiago asked that she be excused from work for four to six weeks starting on May 21, 2007.

134.    On or around May 23, 2007 Plaintiff filed a second charge of discrimination at 533-2007 -01156 alleging a sexually hostile environment and retaliation for previously complaining of discrimination based on sex and disability.

135.    Plaintiff returned to work around August 8, 2007 to work 9:00 to 5:00 p.m. but her doctor's request for a change of hours due to hypersomnia was rejected.

21

136.    Dr. Santiago's diagnosis changed to the extent that he also diagnosed Plaintiff with post-traumatic stress disorder and obsessive compulsive disorder.  Both Plaintiff's doctor and therapist were adamant that Plaintiff not return to her prior job.

137.    On or around September 4, 2007, Plaintiff was subjected to still another investigation.  Steinberg told Plaintiff that various personnel materials about her kept by Steinberg had been stolen out of his office on August 22, 2007, and although this meant that Plaintiff's personal information could be in the possession of a prisoner, Plaintiff was questioned if she took the records.

138.    On September 12, 2007, Plaintiff, who had filed a grievance regarding the manner in which she and her clothing were inspected, learned that her grievance was denied, and that she was now also accused of wearing inappropriate shoes, and that the DOC had questioned other female employees about her clothing.

139.    On or around October 4, 2007, the Commonwealth changed Plaintiff's supervisor from Steinberg to the new Deputy Superintendent Mahlmeister, and after years of delayed requests, agreed to move her office but with a disciplinary caveat in that Plaintiff was no longer permitted to see inmates in her office.

140.    On or around October 19, 2007, when Plaintiff learned that she would receive a counseling based on her discussion with her co-worker where she expressed her fear of Steinberg, she experienced so severe a panic attack that her blood pressure rose precipitously, and she had to be seen in the Emergency Room.  Her family doctor kept her off work, releasing her on October 22, 2007.

141.    When Plaintiff attempted to return to work, she was denied entry to the facility and

22

learned that throughout the facility, the Superintendent had posted notices excluding her, all of which was humiliating and the source of many comments and rumors.

142.   Only through intervention of her counsel, was Plaintiff permitted to return to work.

143.   On or around October 30, 2007, in the presence of her union representative, Plaintiff received a "formal supervisory counseling" related to Steinberg's EEO complaint against her.

144.   Although she "reported" to Mahlmeister, Steinberg still assigned her psychology duties.

145.   Over the next few months, Plaintiff became aware that she was being assigned more duties than her co-workers and at the same time, she lost the assistance of her clerk typist, was denied a key to the Psychology Department mailbox and her central mailbox in the break room, and as a result did not have access to any mail that was delivered to her by both staff and inmates, even though she was a professional.

146.   On or around April 8, 2008, Plaintiff found sexually offensive materials in her mailbox which was located in a staff break room with other mailboxes.

147.   The unsolicited written materials involved an ad for K-Y jelly, an article on flirting, an article on sex, and an advertisement featuring a bikini.

148.   Staff could place items in Plaintiff's mail box directly but inmates would have to give the mail to an internal mailman to place in Plaintiff's box in the break room.

149.   Mahlmeister refused to allow Plaintiff to have a key to her mailboxes so her mail was delivered through his secretary, although other members of the psychology department had keys.

150.   When Plaintiff moved to another building, at times she failed to receive important mail from the psychology department mailbox or the central mail box in the staff break room and the staff knew that Mahlmeister would not allow Plaintiff to obtain her own mail.

151.    Plaintiff provided a copy of the sexually related materials to Mahlmeister and told him she was very upset by these materials.

152.    To the best of Plaintiff's knowledge, no investigation of these documents or the rumors that were about her was ever conducted, even though at least one investigation occurred when a mail guard who was a Muslim received anti-Muslim documents.

153.    As a result of these ongoing events, Plaintiff began to feel that her effectiveness was damaged and that she was in danger since it was clear she had no protection from the administration.

154.    When she again approached Mahlmeister on or around April 16, 2008, he was harsh with her, and told her that she had better get to work, and advised her that maybe "you should leave if this is stressing you out," all of which caused Plaintiff to become more anxious and distressed.

155.    Thereafter, on or around April 24, 2008, Plaintiff told Mahlmeister that she was feeling sick again and would need to take another leave.  She asked several officers if she could take her personal belonging in that when she was previously off, her office had been ransacked and personal possessions lost.

156.    Thereafter, a Captain appeared and told her that Mahlmeister wanted her out immediately, and in the presence of others escorted her and her personal possessions out of the facility.

157.    Effective April 25, 2009, Plaintiff's doctor directed Plaintiff to take another medical leave, and thereafter advised that to return would be detrimental to her health.

158.    Plaintiff  was constructively discharged on or around July 22, 2008 when she submitted papers for disability retirement after her doctor adamantly insisted that she could not work in her

prior position because of the hostile, pervasive atmosphere.

159.    Plaintiff, at all times relative hereto, suffered from and was treated for depression, anxiety, and post traumatic stress disorder among other diagnoses.

160.    Because of her medical condition, Plaintiff suffered from sleep disturbances, panic attacks with elevated blood pressure and rapid heart beats, fatigue, trouble concentrating, some memory deficits, among other symptoms.

161.    Because of her condition, Plaintiff has physical and/or mental impairments that substantially limit several major life activities including difficulty concentrating, sleep disorder, excessive fatigue, feelings of extreme sadness and dysphoria, abject feelings of excessive shame and guilt, hypervigilence, and panic with elevated blood pressure and rapid heartbeat.

162.    Plaintiff has a record of physical and/or mental impairments that substantially limits several major life activities and is regarded as having physical impairments that substantially limit several major life activities.

163.    Plaintiff has a disability within the meaning of the Rehabilitation Act 29 U.S.C. § 794, and the Americans with Disabilities Act.

164.    On December 4, 2008, Plaintiff filed a third charge of discrimination at No. 533-2009-00295 based on her constructive discharge and alleging continuing claims of violation of Title VII and retaliation for complaining os said violations, continuing violations of the Americans with Disabilities Act and retaliation for complaining of said violations.

165.    On September 30, 2009, the Equal Employment Opportunity issued a determination that evidence obtained during the investigation established a violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII) and the Americans with Disabilities Act of 1990 (ADA), a

copy of which is attached as Exhibit 1.

## COUNT I

### Section 504 of the Rehabilitation Act, as amended

### Claims of discrimination based on disability and retaliation

166.    Plaintiff incorporates Paragraphs 1 through 165 by reference as thought full set forth herein.

167.    At all times relevant hereto, as set forth above, Defendant engaged in a continuing course of conduct of harassment and retaliation based on Plaintiff's disability, her requests for accommodations, and her raising claims of discrimination.

168.    At all times relevant hereto, Plaintiff was a qualified handicapped person who met the eligibility requirements of her position.

169.    Defendant discriminated against Plaintiff and treated her adversely and disparately from her co-workers based on her disability.

170.    Defendant permitted Plaintiff to be harassed and retaliated against after she disclosed her disability.

171.    Defendant refused to enter into an interactive process and establish proper accommodations for Plaintiff.

172.    Upon becoming aware of Plaintiff's requests for accommodations and her claims of discrimination, Defendant began a long, continuing course of retaliation against Plaintiff.

173.    Defendant was motivated by an invidious discriminatory and retaliatory animus against Plaintiff as a person with a disability, one who had a history of a disability, or one perceived to have a disability.

174.    As a direct and proximate consequence of Defendant's unlawful and discriminatory treatment of Plaintiff, Plaintiff has suffered a loss of income, including salary and benefits, loss of job opportunity, as well as physical and emotional pain and suffering.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

a.    Award Plaintiff all lost wages and benefits;

b.    Award Plaintiff such other nominal, general, compensatory damages as may be available under law;

c.    Issue a mandatory injunction requiring:

    i.    Defendant to provide employment to Plaintiff commensurate with her education and experience, and with the reasonable accommodations that she may need;

    ii.    Defendant restore to Plaintiff all sick and vacation days that she lost due to the need to take leave because of a failure to accommodate her;

    iii.    Defendant provide Plaintiff with all rights, privileges and benefits of seniority dating back to her last day of work;

d.    Award Plaintiff her costs, disbursements and reasonable attorney's fees as may be available under law;

e.    Assume continuing and indefinite jurisdiction in order to ensure compliance with the terms of the mandatory injunction;

f.    Grant such additional relief as this Court may deem just and equitable.

## COUNT II

27

## Title VII of the Civil Rights Act of 1964, as amended

### Hostile Environment

175.    Plaintiff incorporates Paragraphs 1 through 174 by reference as thought full set forth

176.    The effect of the practices complained of above in allowing Plaintiff to be subject to a

 hostile and dangerous environment has been to deprive Plaintiff of equal employment

opportunities and otherwise affect adversely her status as an employee because of her sex.

177.    Plaintiff suffered harassing acts from Defendant which created a hostile environment as

 set forth in this complaint include but are not limited to:

      a.      Allowing Plaintiff to be subjected to false sexually related rumors about her

              spread by staff and inmates;

      b.      Treating Plaintiff differently than her co-workers as a result of the false sexual

              rumors;

      c.      Failing to properly train its high level management so as to preclude the

              Superintendent from making inappropriate advances toward her;

      d.      Being subject to the advances of the Superintendent;

      e.      Failing to assure that its policies against sexual harassment was properly enforced;

      f.      Allowing Plaintiff's office to be ransacked and an embarrassing memo displayed;

      g.      Failing to investigate said rumors and thereby creating a potentially dangerous

              condition for plaintiff to the extent that she received sexually inappropriate

              material in her mail box;

      h.      Forcing Plaintiff to be overtly scrutinized in regard to her buttocks region by two

              male managers on the pretext of examining the appropriateness of her clothing;

28

i.     Assigning a manager to oversee Plaintiff who had a history of psychological abuse of a vulnerable female to extent of having his psychology license publically suspended;

178.   Defendant intentionally subjected Plaintiff to a long, continuing course of discriminatory conduct, and sexually hostile environment.

179.   The effect of the practices complained of in the complaint has been to deprive Plaintiff of equal employment opportunities and otherwise affect her status as an employee in creating a hostile work environment and because she engaged in protected activity under Title VII.

180.   The unlawful employment practices complained of  above were intentional.

181.   The unlawful employment practices complained of in paragraphs 1- 177 above were intentional and done with malice or with reckless indifference to the federally protected rights of Plaintiff as asserted in this Complaint.

182.   As a direct and proximate consequence of Defendant's unlawful and discriminatory treatment of Plaintiff, Plaintiff has suffered a loss of income, including salary and benefits, loss of job opportunity, as well as physical and emotional pain and suffering, and fear.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

a.     Grant a permanent injunction enjoining Defendant from engaging in sexual harassment, and retaliating against employees for complaining about discriminatory practices by harassing them into illness and forcing them out of the workplace.

b.     Order Defendant to institute and carry out policies, practices and programs which provide equal employment opportunities for women in the corrections system which eradicate the

29

effects of its past and present unlawful employment practices.

  c.  Order Defendant to institute and carry out anti- discrimination and sexual harassment policies and complaint procedures.

  d.  Order Defendant to institute and carry out complaint procedures which encourage employees to come forward with complaints regarding violations of its policies against discrimination, harassment and retaliation and making it clear, that by doing so, those who complain will not be harassed.

  e.  Order Defendant  to institute and carry out a training program which shall promote supervisor accountability imposing on all managers and supervisory personnel a duty to actively monitor their work areas to ensure compliance with policies on non-discrimination and anti-harassment: and requiring all managers and supervisors to report any incidents and/or complaints of harassment and/or retaliation of which they become aware to the department charged with handling such complaints.

  f.  Order Defendant to make whole Plaintiff by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, reinstatement or front pay in lieu thereof, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

  g.  Order Defendant Employer to make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs  above, in amounts to be determined at trial.

  h.  Order Defendant to make Plaintiff whole by providing compensation for  past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, depression, anxiety, inconvenience, loss of enjoyment of life and

humiliation, or the exacerbation thereof, in amounts to be determined at trial.

    i.      Order Defendant to pay attorneys' fees and costs.

    j.      Grant such farther relief as the Court deems necessary and proper.

## COUNT III

### Retaliation in violation of the Rehabilitation Act

183.    Plaintiff incorporates Paragraphs 1 through 182 by reference as thought fully set forth herein

184.    Plaintiff sought accommodations for her disability.

185.    When Plaintiff did not receive the requested accommodations, she raised issues of discrimination and retaliation through correspondence and verbal communication with the Superintendent and other management of SCI-Mercer.

186.    When complaints failed to bring results, Plaintiff filed administrative complaints regarding the failure to accommodate her and retaliation.

187.    After Plaintiff raised complaints of discrimination and a failure to accommodate, she became subject to a series of continuing retaliatory actions ultimately resulting in her constructive discharge.

188.    As a result of seeking accommodations and raising complaints of discrimination and retaliation, Plaintiff suffered retaliatory acts from Defendant as set forth in this complaint including but are not limited to:

    a.      Allowing Plaintiff to be subjected to false sexually related rumors about her spread by staff and inmates;

    b.      Allowing Plaintiff's office to be ransacked while she was on sick leave so she returned with missing furniture and disabled equipment;

31

c.      Failing to investigate who ransacked her office although forcing Plaintiff to be overtly scrutinized in regard to her buttocks region by two male managers on the pretext of examining the appropriateness of her clothing;

d.      Subjecting Plaintiff to onerous conditions such as reporting daily to Steinberg although her professional co-workers were not required to do so;

e.      Assigning a manager to oversee Plaintiff who had a history of psychological abuse of a vulnerable female to extent of having his psychology license publically suspended.;

f.      Subjecting Plaintiff to a pretextual complaint by Steinberg when Plaintiff expressed concern regarding Steinberg's openly acknowledged background of a suspended psychology license and the requirement that he have special supervision;

g.      Reducing Plaintiff's performance evaluation after she sought accommodations although she had good performance evaluations before;

h.      Refusing to allow Plaintiff direct access to her mailboxes even though she was a professional and received professional mail related to her duties as a psychologist;

i.      Refusing to promptly provide Plaintiff with a key to the nearby restroom;

j.      Imposing onerous assignments on Plaintiff and refusing to allow her the same ability to work longer hours to complete them;

k.      Continuing refusal to transfer her working location for years;

l.      Continuing refusal to allow her to modify her hours while allowing others to do so;

m.      Marching her out of the facility or threatening to march her out of the facility as if she had committed a heinous act when she left on medical leave;

n.      Subjecting her to discipline which never occurred before she sought accommodations

32

or complained of discrimination and the failure to provide accommodations;

    o.      Failing to investigate actions taken against her such as the ransacking of her office.

    p.      Refusing to allow Plaintiff to return to work after she became ill and had to seek emergency attention but was released to return;

189.    As a direct and proximate consequence of Defendant's unlawful and discriminatory treatment of Plaintiff, Plaintiff has suffered a loss of income, including salary and benefits, loss of job opportunity, as well as physical and emotional pain and suffering, and fear.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

    a.      Grant a permanent injunction enjoining Defendant from engaging in retaliatory acts against employees for complaining about discriminatory practices related to their disabilities and the failure to provide accommodations.

    b.      Order Defendant to institute and carry out policies, practices and programs which provide equal employment opportunities for those with disabilities in the corrections system which eradicate the effects of its past and present unlawful employment practices.

    c.      Order Defendant to institute and carry out anti- discrimination and retaliation policies and procedures.

    d.      Order Defendant to institute and carry out complaint procedures which encourage employees to come forward with complaints regarding violations of its policies against disability discrimination and making it clear, that by doing so, those who complain will not be harassed.

    e.      Order Defendant  to institute and carry out a training program which shall promote supervisor accountability imposing on all managers and supervisory personnel a duty to actively

monitor their work areas to ensure compliance with policies on non-discrimination and anti-harassment, and requiring all managers and supervisors to report any incidents and/or complaints of harassment and/or retaliation of which they become aware to the department charged with handling such complaints.

   f.  Order Defendant to make whole Plaintiff by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, reinstatement or front pay in lieu thereof, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

   g.  Order Defendant Employer to make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs above, in amounts to be determined at trial.

   h.  Order Defendant to make Plaintiff whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, depression, anxiety, inconvenience, loss of enjoyment of life and humiliation, or the exacerbation thereof, in amounts to be determined at trial.

   i.  Order Defendant to pay attorneys' fees and costs.

   j.  Grant such farther relief as the Court deems necessary and proper.

## COUNT IV

### Retaliation in Violation of Title VII

190. Plaintiff incorporates Paragraphs 1 through 189 by reference as thought fully set forth herein.

191. After being subject to a continuing course of sexual harassment and continuing hostile environment, Plaintiff began to file a series of complaints with the EEOC, all as set forth above.

192.    As a result of filing the complaints, Defendants' hostile conduct did not abate but continued and also resulted in retaliation discrimination toward Plaintiff.

193.    After Plaintiff raised complaints of discrimination and a failure to accommodate, she became subject to a series on continuing retaliatory actions which were aimed toward her as a complaining employee but which were also of a nature to create a sexually hostile environment.

194.    As a result of seeking accommodations and raising complaints of discrimination and retaliation, Plaintiff suffered retaliatory acts from Defendant as set forth in this complaint including but are not limited to:

a.    Allowing Plaintiff to be subjected to continuing false sexually related rumors about her spread by staff and inmates and failing to investigate the rumors;

b.    Allowing Plaintiff's office to be ransacked while she was on sick leave so she returned with missing furniture and disabled equipment and an embarrassing memo was openly displayed;

c.    Failing to investigate who ransacked her office although Defendant conducted investigations into other matters where employees claimed to be harassed or discriminated against;

d.    Subjecting Plaintiff to onerous conditions such as reporting daily to Steinberg upon arrival each day while no professional co-worker was subjected to the same condition;

e.    Assigning a manager to oversee Plaintiff who had a history of psychological abuse of a vulnerable female to extent of having his psychology license publically suspended;

f.    Subjecting Plaintiff to a pretextual complaint by Steinberg when Plaintiff expressed concern regarding Steinberg's opening acknowledged background of a suspended psychology license and the requirement that he have special supervision;

35

g.       Reducing Plaintiff's performance evaluation after she sought accommodations although she had good performance evaluations before;

h.       Refusing to allow Plaintiff direct access to her mailboxes even though she was a professional and received professional mail related to her duties as a psychologist

i.       Refusing to promptly provide Plaintiff with a key to the nearby restroom;

j.       Imposing onerous assignments on Plaintiff and refusing to allow her the same ability to work longer hours to complete them;

k.       Continuing refusal to transfer her working location for years;

l.       Continuing refusal to allow her to modify her hours while allowing others to do so;

m.       Marching her out of the facility or threatening to march her out of the facility as if she had committed a heinous act when she left on medical leave;

n.       Subjecting her to discipline which never occurred before she sought accommodations or complained of discrimination and the failure to provide accommodations;

o.       Failing to investigate actions taken against her such as how sexually inappropriate and disturbing materials were placed in her mailbox;

195.     As a direct and proximate consequence of Defendant's unlawful and discriminatory treatment of Plaintiff, Plaintiff has suffered a loss of income, including salary and benefits, loss of job opportunity, as well as physical and emotional pain and suffering, and fear.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff respectfully requests that this Court:

a.       Grant a permanent injunction enjoining Defendant from engaging in retaliatory acts against employees for complaining about discriminatory practices related to their sex and a hostile

environment.

b.      Order Defendant to institute and carry out policies, practices and programs which provide equal employment opportunities for females disabilities in the corrections system which eradicate the effects of its past and present unlawful employment practices.

c.      Order Defendant to institute and carry out anti- discrimination policies and procedures.

d.      Order Defendant to institute and carry out complaint procedures which encourage employees to come forward with complaints regarding violations of its policies against sex discrimination and a hostile environment, making it clear, that by doing so, those who complain will not be harassed and retaliated against further;

e.      Order Defendant to institute and carry out a training program which shall promote supervisor accountability imposing on all managers and supervisory personnel a duty to actively monitor their work areas to ensure compliance with policies on non-discrimination and anti-harassment, and requiring all managers and supervisors to report any incidents and/or complaints of harassment and/or retaliation of which they become aware to the department charged with handling such complaints.

f.      Order Defendant to make whole Plaintiff by providing appropriate back pay with prejudgment interest, in amounts to be determined at trial, reinstatement or front pay in lieu thereof, and other affirmative relief necessary to eradicate the effects of its unlawful employment practices.

g.      Order Defendant Employer to make Plaintiff whole by providing compensation for past and future pecuniary losses resulting from the unlawful employment practices described in paragraphs above, in amounts to be determined at trial.

37

h.      Order Defendant to make Plaintiff whole by providing compensation for past and future non-pecuniary losses resulting from the unlawful practices complained of above, including emotional pain, suffering, depression, anxiety, inconvenience, loss of enjoyment of life and humiliation, or the exacerbation thereof, in amounts to be determined at trial.

i.      Order Defendant to pay attorneys' fees and costs.

j.      Grant such farther relief as the Court deems necessary and proper.

## COUNT V

## Americans with Disabilities Act

182.    Plaintiff incorporates Paragraphs 1 through 181 by reference as thought fully set forth herein.

196.    At all times relevant hereto, as set forth above, Defendant engaged in a continuing course of conduct of harassment and retaliation based on Plaintiff's disability, her requests for accommodations, and her raising claims of discrimination.

197.    At all times relevant hereto, Plaintiff was a qualified handicapped person who met the eligibility requirements of her position.

198.    Defendant discriminated against Plaintiff and treated her adversely and disparately from her co-workers based on her disability.

199.    Defendant permitted Plaintiff to be harassed and retaliated against after she disclosed her disability.

200.    Defendant refused to enter into an interactive process and establish proper accommodations for Plaintiff.

201.    Upon becoming aware of Plaintiff's requests for accommodations and her claims of

discrimination, Defendant began a long, continuing course of retaliation against Plaintiff.

202.    Defendant was motivated by an invidious discriminatory and retaliatory animus against

 Plaintiff as a person with a disability, one who had a history of a disability, or one perceived to have a

disability.

203.    As a direct and proximate consequence of Defendant's unlawful and discriminatory

 treatment of Plaintiff, Plaintiff has suffered a loss of income, including salary and benefits, loss of job

opportunity, as well as physical and emotional pain and suffering.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Honorable Court:

a.      Issue a mandatory injunction requiring:

      i.      Defendant to provide employment to Plaintiff commensurate with her

          education and experience, and with the reasonable accommodations that she

          may need;

      ii.     Defendant to restore to Plaintiff all sick and vacation days that she lost due to

          the need to take leave because of a failure to accommodate her;

      iii.    Defendant to provide Plaintiff with all rights, privileges and benefits of

          seniority dating back to her last day of work;

b.      Assume continuing and indefinite jurisdiction in order to ensure compliance with the

terms of the mandatory injunction;

c.      Grant such additional relief as this Court may deem just and equitable.

                        Respectfully Submitted,

S/David F. Weiner                            S/Helen R. Kotler
David F. Weiner, Esquire                     Helen R. Kotler, Esquire

39

Attorney for Plaintiff
PA ID# 18808
Carlin & Weiner
Suite 660 U. S. Steel Building
600 Grant Street
Pittsburgh, PA 15219
Email address: dfweiner@prosuites.com
Telephone: (412) 391-2857
Fax: (412) 261-2760

Attorney for Plaintiff
PA ID# 23572
Law Offices of Helen R. Kotler
Suite 1110 Centre City Tower
650 Smithfield Street
Pittsburgh, PA 15222
Email address: hrkotler@yahoo.com
Telephone: (412) 281-6538
Fax: (412) 281-7625